**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| YIFEI HE | : | CIVIL NO. |
| *Plaintiff,* | : | 3:13-CV-1785-(MPS) |
| | : | |
| *v.* | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT, | : | |
| JANE BROWN, LISA OUELLETTE, | : | |
| and SUSAN SEVERO, | : | |
| *Defendants* | : | February 3, 2014 |

**SECOND AMENDED COMPLAINT**

Plaintiff Yifei He, pursuant to Federal Rules of Civil Procedure 15(a) respectfully submits the following amended Complaint:

## THE NATURE OF THIS ACTION

1. This case arises out of the actions taken and procedures employed by Defendant Susan Severo, Lisa Ouellette, Jane Brown, and the University of Connecticut ("Defendants") regarding Plaintiff's application for Student Employment and Plaintiff's preparation for Law School Final Examinations.

2. Defendants discriminated against Plaintiff on the basis of his race and nationality through the use of intimidation, harassment, and abuse, among other things.

3. Defendants' actions have severely damaged Plaintiff's academic future in the United States, diminished Plaintiff's economic prospects, and have put to waste Plaintiff's monies spent on obtaining a legal education at the University of Connecticut and the sacrifices to his family in pursuit of his legal education.

4. Plaintiff therefore brings this action to obtain declaratory and injunctive relief and damages based on causes of action for, among other things, violations of federal and state law.

## **PARTIES**

5. Plaintiff is a Citizen of Canada over the age of 18.

6. Defendant University of Connecticut ("UConn") is a public postsecondary institution organized under the laws of Connecticut, located in the State of Connecticut. Defendant, UConn is directly and indirectly responsible through its agents and/or representatives, for the implementation of policies, practices and customs challenged herein.

7. Defendant Jane Brown ("Brown") is a resident of Connecticut and at least 18 years of age, and was, upon knowledge and belief, employed at all relevant times as the Director of Student Affairs at the University of Connecticut School of Law. Defendant Brown is sued in her individual and official capacities.

8. Defendant Susan Severo ("Severo") is a resident of Connecticut and at least 18 years of age, and was, upon knowledge and belief, employed at all relevant times as the Director of Student Employment at the University of Connecticut School of Law. Defendant Severo is sued in her individual and official capacities.

9. Defendant Lisa Ouellette ("Ouellette") is a resident of Connecticut and at least 18 years of age, and was, upon knowledge and belief, employed at all relevant times as the Student Employment Program Assistant at the University of Connecticut School of Law. Defendant Ouellette is sued in her individual and official capacities.

## **JURISDICTION AND VENUE**

10. Plaintiff brings this action pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 1983.

11. This Court has jurisdiction over the federal claims presented in this action pursuant to 28 U.S.C. §§1331 and 1343(a)(3).

12. This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because Yifei He is a citizen of a foreign state and Defendants are citizens of the United States. The amount in controversy also exceeds $75,000, exclusive of costs and interest.

13. The Court has supplemental jurisdiction over the State law claim pursuant to 28 U.S.C. 1367.

14. Venue for this action properly lies in this jurisdiction pursuant to 28 U.S.C. § 1391 because: (i) it is a judicial district in which defendants reside, and all defendants are residents of the State in which the district is located; and (ii) a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

15. Declaratory and injunctive relief is authorized by 28 U.S.C.A. §§ 1343(a)(4), 2201, and 2202.

## FACTS

16. At all relevant times, Plaintiff was an international student at UConn from Canada and a visible minority of Asian descent.

17. In September of 2010, Plaintiff enrolled in the Juris Doctor program at UConn. As an international student, Plaintiff pays more than double the amount of tuition Connecticut residents pay.

18. Since Plaintiff would not be eligible for in-state tuition status, Plaintiff sought to obtain part-time on-campus student employment to defray the cost of attending UConn.

19. Karen Demeola ("Demeola"), the Assistant Dean for Admissions and Plaintiff's first point of contact with the University, told Plaintiff to consult with the UConn Student Employment Office regarding on-campus student employment.

20. On August 30, 2010, Plaintiff visited the Student Employment Office for the first time. Plaintiff introduced himself to Lisa Ouellette and told her about his status as a Canadian citizen. Plaintiff then inquired into his eligibility for on-campus student employment.

21. Ouellette responded to Plaintiff by rudely telling him that he would not be able to obtain employment. Ouellette curtly told plaintiff that, "American have preference for jobs." Ouellette then told Plaintiff that she would know whether or not jobs would be available for him. Needless to say, Ouellette made Plaintiff feel as though he were a second-class citizen at his own University.

22. On September 19, 2010, Plaintiff corresponded with Demeola to explore alternative ways of obtaining student employment. Plaintiff also mentioned Ouellette's dismissive behaviors, including her stating, "Americans have preference."

23. On September 20, 2010, Demeola corresponded with Plaintiff regarding his concerns. Demeola stressed UConn's limited funding for student employment for international students. Demeola told Plaintiff that, "I realize that as an international student you are uniquely impacted." However, Demeola told Plaintiff that his "resume [was] on file." Demeola also encouraged Plaintiff to "continue to work with Ms. Ouellette."

24. On September 21, 2010, the following day, at approximately 9:55 am, as Plaintiff was on his way to his classes, Plaintiff saw Ouellette in front of the UConn Law Library. Visibly upset, Ouellette approached Plaintiff in a very aggressive manner. Plaintiff attempted to gesture his urgency to go to classes by telling Ouellette that he read Demeola's email.

However, Ouellette interrupted Plaintiff, and abruptly told Plaintiff, not to forget that, "he was not *even* American."

25. Ouellette then asked Plaintiff where he preferred to work if he had the opportunity to do so. Plaintiff responded, in good faith, that he would like to work in the library. In response, Ouellette told Plaintiff that, "there was not a chance." Ouellette stated that, "99.9%" of on-campus employment was *limited* to American students."

26. Plaintiff had lingering concerns about the high rate of tuition for Out-of-State Students. On December 2, 2010, Plaintiff asked Brown, who was tasked with the responsibilities of helping students establish Connecticut Residency, about his eligibilities for In-State Tuition. During their conversation, Plaintiff identified himself as a Canadian Citizen. In response, Brown asked Plaintiff if he possessed dual citizenship. To which, Plaintiff responded in the negative.

27. Brown was also the University liason for the Student Medical Insurance Program. On December 6, 2010, Plaintiff had received a bill for medical services rendered by Hartford Hospital. Not familiar with the American medical insurance system, Plaintiff consulted with Brown about insurance coverage for his costs.

28. On December 9, 2010, in response to both Plaintiff's inquiries about Connecticut Residency as well as his inquiries about insurance coverage, Brown forwarded Plaintiff an email from Rae Barter, Plaintiff's designated International Students advisor. The email purported to bar Plaintiff from establishing Connecticut Residency. Brown then told Plaintiff, "[s]orry this is not the news you were hoping for. I hope your insurance situation has been resolved."

29. On December 10, 2010, Professor Mark Janis, the William F. Starr Professor of International Law ("Janis"), finally offered Plaintiff a position as a research assistant.

30. After discussing with both UConn Career Services and Janis about the employment opportunity and job specifics, Plaintiff gladly accepted Janis's offer of employment to commence in mid-January.

31. Plaintiff then went to the Student Employment Office ("Office") to inquire about the Student Employment hiring process.

32. At the Office, Plaintiff informed Ouellette about his employment opportunity with Janis to begin in mid-January. Ouellette responded by condescendingly asking whether Plaintiff, "received Janis's autograph." To which, Plaintiff responded in the negative.

33. Notwithstanding Ouellette's remarks, Plaintiff inquired into the steps for completing his paperwork for Student Employment. Plaintiff asked Ouellette if it was acceptable for him to produce his passport at a later date. In response, Ouellete told Plaintiff that Plaintiff must produce his passport that day to continue with the hiring process.

34. Plaintiff informed Ouellete that he could not bring in his passport that day because his passport would be expiring on December 12, 2010 and that he sent the document "en route for renewal."

35. Ouellette then gave plaintiff an ultimatum. Ouellette stated to Plaintiff that December 10, 2010 would be the only day Plaintiff could bring in his passport. Since December 12, 2010 was a Sunday and his passport would expire next Monday, if Plaintiff did not bring in his passport to the Office on Friday, December 10, he would not be hired.

36. Meanwhile, the United States Customs and Immigration Services ("USCIS") Employment Eligibility I-9 Form ("I-9") states on its face, "[t]he refusal to hire an

individual because the documentation presented has a *future expiration date* may also constitute illegal discrimination." The I-9 also states, in bold letters, that verification of employment eligibility would not be required until "the first day of employment."

37. Nevertheless, Ouellette pushed Plaintiff to provide his passport. In the alternative, Ouellette demanded Plaintiff provide a logical explanation as to where his passport was located.

38. Not familiar with the USCIS regulations at the time, Plaintiff told Ouellette that he did not want to miss out on the opportunities for Student Employment and asked Ouellette if there were any alternatives.

39. In response, Ouellette told Plaintiff that she would consult with staff members of the University of Connecticut Storrs Campus ("Uconn Storrs"). Ouellette requested that Plaintiff to return to the Office in the afternoon with all the documentation he had in possession.

40. During the conversation with Plaintiff, Ouellette possessed the I-9, detailing the list of documents necessary to complete the student employment process. Although Plaintiff asked Ouellette for a copy of the I-9, Ouellette told Plaintiff, "you don't need this" and refused to give the I-9 to Plaintiff.

41. In response to Plaintiff's inquiry about when the Office would close, Ouellette stated that the Office would close at 5:00 pm. Ouellette also snidely told Plaintiff to, "not wait until the last minute."

42. Upon Plaintiff's agreeing to bring in his documentation to the Office, Ouellette, in front of the Student Secretary, Elise Baun, began to mock Plaintiff's manner of speech.

Mimicking Plaintiff, Ouellette repeated, "Uh huh…uh huh…okay... okay," multiple times. The incident greatly embarrassed Plaintiff.

43. Subsequently, as ordered, Plaintiff went home and searched for all the official documents he had in his possession, including his Canadian citizenship card, his Quebec Medical Identification card, his Canadian social insurance number, his I-94, his SEVIS, and a photocopy of Plaintiff's original passport.

44. Around 4:00 pm on December 12, 2010, Plaintiff brought in his official documents to the Student Employment Office.

45. Upon seeing Plaintiff, Ouellette told him that she had not yet had an opportunity to speak with UConn Storrs personnel. Ouellette then smugly told Plaintiff that she had both emailed and called the Storrs Office, with the same result, a "non-response."

46. Upon reviewing Plaintiff's documents, Ouellette rudely told Plaintiff that his documents were unacceptable. There was no further explanation.

47. Plaintiff then told Ouellette that he did have a photocopy of his passport. Plaintiff asked Ouellette if a photocopy would suffice until he could produce his renewed passport.

48. Plaintiff suggested that he could bring in his passport after it was renewed and explained options for expedited renewal with the Canadian Embassy.

49. Ouellette refused to accept Plaintiff's passport photocopy. Ouellette, pointing to Plaintiff's photograph on his passport photocopy, and while looking at Elise Baun, remarked, "the picture looks as though it is blown up."

50. Plaintiff then asked Ouellette if he could check Passport processing times with the Canadian Embassy. In response, Ouellette pointed to a corner of the room, where Plaintiff could check his laptop.

51. After reviewing the passport processing times, Plaintiff reported to Ouellette that next-day processing times for renewing his passport were available. In response, Ouellette told Plaintiff to, "get out" of her office.

52. As Plaintiff was leaving the Office, Plaintiff asked Ouellette for a copy of the I-9 detailing the employment process and describing the list of acceptable documents, which Ouellette had not yet given to Plaintiff. In response, Ouellette condescendingly remarked, "How's that going to help you?"

53. Subsequently, Ouellette swung a document carousel containing the I-9, while whistling a tune to herself. After making Plaintiff wait, Ouellette finally handed the I-9 to him.

54. Then, attempting to reconcile with Ouellette, Plaintiff asked, in good faith, to consider his position with Janis and his start in early January. Ouellette responded by telling Plaintiff, "The answer is NO." Ouellette then coldly stated that she would report Plaintiff's ineligibility to Janis.

55. A while after leaving the Office, Plaintiff examined the I-9 and realized that he still had questions regarding specific portions of the form. Plaintiff then went back to the Office to speak with Ouellette.

56. Upon entering the Office, Plaintiff noticed that Ouellette had left her post at the front desk. Plaintiff then heard Ouellette converse with Susan Severo out of sight.

57. Plaintiff heard Ouellette tell Severo that she met with someone who had told her, "two different stories about where their passport was," and that despite her having provided him with information and paperwork, was nevertheless, "desperate," and both "rude and unreasonable."

58. As Plaintiff began to feel uncomfortable and turned to leave the Office, Ouellette and Severo suddenly appeared and approached Plaintiff, cornering him and preventing him from leaving.

59. Seeing that Severo was Ouellette supervisor, Plaintiff tried to ask Severo a question about his eligibility for Student Employment.

60. Severo interjected to Plaintiff's inquiry without listening to him, shook her head, and told Plaintiff that he would not be able to get work authorization.

61. Severo then asked Plaintiff whether or not he had been rejected at the Social Security Bureau and whether or not Plaintiff had received an actual letter of rejection. Plaintiff told Severo that he had been given a letter stating that he was not eligible to obtain a Social Security card without employment authorization. Severo then stated condescendingly, "that is an example."

62. Plaintiff then asked Severo if she would be willing to keep the photocopy of his passport as a record. In response, Severo took Plaintiff's passport photocopy and in Plaintiff's presence, made a photocopy of Plaintiff's passport photocopy, then rudely handed Plaintiff's passport photocopy back to him.

63. Severo then grabbed a stack of USCIS forms on the document carousel. Severo was aware that Ouellette had previously handed Plaintiff the same paperwork. Nevertheless, Severo proceeded to aggressively slam each form loudly on a table, close to Plaintiff's face, while stating caustically that plaintiff was missing such paperwork.

64. Simultaneously, Ouellette waived malicious and offensive gestures in the background and contorted her facial expression and made ugly grimaces on her face as a mockery of Plaintiff's state of being.

65. Severo followed up her violent actions by threatening Plaintiff. Severo stated that previously, Federal agents had come and literally dragged students out of their classrooms because they did not have their paperwork on them.

66. Needless to say, the interaction left Plaintiff with feelings of mental anguish and emotional distress. Plaintiff exited the Office and tried to use the rest of the afternoon to study for his final examinations.

67. Around 5:30 p.m., Plaintiff received an email from Severo, telling Janis that Plaintiff was ineligible for Employment with him. Severo stated that Plaintiff was, "not currently in possession of all of the original documentation required by the federal government" and that, "until [Plaintiff] completes his paperwork … he may not begin work."

68. Around 5:40 p.m., Plaintiff, who was studying by himself in the library, saw Severo, as she was leaving the Office. Upon seeing Plaintiff sitting in the library with his textbooks, Severo proceeded to head back into the Office. Moments later, Severo reemerged from the Office, this time carrying several large, empty cardboard boxes. Severo then approached Plaintiff.

69. As Severo approached, Plaintiff tried to ask Severo whether or not she had heard back from Storrs Personnel. In response, Severo told Plaintiff to follow her to her office because they should not talk too loudly in the library. Plaintiff then proceeded to the Office with Severo.

70. In the Office, Severo told Plaintiff that she felt sorry for him because he did not have the right documents at hand or the "correct" nationality. Severo then told Plaintiff that if he were a U.S. citizen, he would not need to go through this.

71. Severo then took out a piece of paper and a pen and demanded that Plaintiff tell her where his passport was located. Plaintiff repeated that his passport was en route for renewal. Plaintiff also mentioned that expedited processing options were available with the Canadian Embassy.

72. Suddenly, Severo's tone and demeanor changed. Severo adopted a conciliatory attitude towards Plaintiff. Severo told Plaintiff that she empathized with the fact that he was not a U.S. citizen. Severo told Plaintiff that, "sometimes you either have something or you don't," and that there was nothing she could do to help him.

73. Severo then told Plaintiff to acknowledge the fact that she was staying overtime to help him. Severo then "begged" Plaintiff to understand that she "was the exception."

74. Upon concluding their conversation, Plaintiff and Severo proceeded to leave the Office. Posted at the exit of the Student Employment Office was a poster depicting a raised fist, with the caption, "SOLIDARITY." Upon seeing the message, Plaintiff responded to Severo by letting her know that he had made an honest mistake in not having his passport.

75. Plaintiff told Severo that he could be forgetful at times. As an aside, Plaintiff joked that he was so clumsy that he had gotten a "papercut" from his studies.

76. In response, Severo smiled at Plaintiff. As the two of them were leaving the Office, Severo told Plaintiff to "have a nice weekend."

77. A few hours later however, at around 9:00 p.m., Plaintiff realized that Brown had left him multiple voice messages on his phone. Moments later, Plaintiff received an urgent phone call from Brown.

78. In the ensuing conversation, Brown told Plaintiff that she had spoken with Severo. Brown told Plaintiff that based upon information supplied by Severo, Brown was under the impression that Plaintiff was in a state of extreme panic and was severely disturbed.

79. Brown told Plaintiff that Severo had told her as well as Assistant Dean Willajeane McLean ("McLean") and Assistant Dean Ann Crawford ("Crawford") that Plaintiff had purposely cut himself and was suicidal. From her impressions of Plaintiff as well as her conversations with Severo, Brown assumed that Plaintiff was in severe physical danger and needed immediate help.

80. Brown also told Plaintiff that, due to Plaintiff's trips to Hartford Hospital, as gleaned from his concerns regarding medical insurance, she suspected Plaintiff had in fact cut himself and was suicidal.

81. In response to Brown's accusations, Plaintiff tried his best to reassure Brown of his mental and physical state of being. Plaintiff also told Brown that he had never stated that he had, "cut himself." Plaintiff told Brown that he felt fine and should be of no concern to the Administration.

82. Notwithstanding Plaintiff's explanations, Brown told Plaintiff to report to the Dean's office the first thing on Monday, December 13, 2013, to properly explain himself to her and Crawford.

83. A while later, around 9:30 p.m., Plaintiff received an e-mail from Janis, informing Plaintiff that, "I think it best that I ask someone else - I'd like to get someone lined up before the holidays."

84. Due to the series of negative interactions and hostile environment created by staff members of UConn, Plaintiff felt extremely distraught and anxious and could not concentrate on his studies.

85. On Monday, December 13, instead of being able to study for his exams, Plaintiff was forced to meet with Brown in her Office.

86. Plaintiff attempted to explain the events of December 10 to the best of his abilities. Plaintiff told Brown that he had never stated to Severo that he had cut himself. Plaintiff also tried to explain the negative interactions he had with Ouellette and Severo.

87. Plaintiff then showed Brown his hands, as well as an abrasion from his winter jacket, which was so faint that it could not be interpreted in any way as signs of self-inflicted harm. Brown responded by laughing, shaking her head, and shrugging her shoulders.

88. Upon hearing Plaintiff's explanations of the interaction he had with Severo and Ouellette, Brown acted very surprised and told Plaintiff that Severo had told her a completely different story.

89. Brown then accused Plaintiff of fabricating Ouellette and Severo's hostile treatment of him. Brown asked Plaintiff why, if he truly felt discriminated against, he did not report Ouellette and Severo to the Administration. Brown then ordered Plaintiff to explain his side of the story to Crawford.

90. On Wednesday, December 15, 2010, attempting to cover up her misdeeds, Severo wrote to the Plaintiff, telling him that, "Professor Janis stated that you and he have not yet agreed that you would work for him, only that you would think about it."

91. As a result of the negative series of interactions and the hostile environment, plaintiff could not effectively prepare or perform on four of his Final Exams, which were each

effectively worth 100% of Plaintiff's grades, and which started December 14 and ended on December 22, 2010.

92. Plaintiff's GPA for the Fall 2010 semester was a 2.925. At graduation, UConn ranked Plaintiff's in the Fourth Quintile of his Class. Excluding the Fall 2010 semester, Plaintiff's cumulative GPA in subsequent semesters is 3.441.

93. On January 4, 2011, Plaintiff filed a complaint of discrimination with UConn's Office of Diversity and Equity ("ODE"), challenging the incident, and naming Susan Severo and Lisa Ouellette as Respondents.

94. On January 14, 2011 Plaintiff scheduled a meeting with Mr. Al Lizana ("Lizana"), the Case Manager responsible for investigating Plaintiff's Complaint. Although the meeting was scheduled for 9:00 am, Lizana failed to show up until 11:00 am. Mr. Lizana's actions interrupted and impeded Plaintiff's schedule, especially his preparation for his Moot Court Class Brief Assignment, due the same day.

95. During the meeting with Lizana, Lizana refused to listen to Plaintiff's explanations. Instead, Lizana debunked the merits of Plaintiff's discrimination claims.

96. Lizana repeatedly told Plaintiff of the difficulties in proving discrimination. Lizana told Plaintiff that so long as Severo and Ouellette possesses the commonsense ability to deny his claims, Plaintiff would fail in proving discrimination.

97. According to 3.2.2 of the "The University Of Connecticut Discrimination and Discriminatory Harassment Complaint Procedures," claims of discrimination must be resolved within seventy-five (75) calendar days. Otherwise, Complainant will be notified of time limits to file with state or federal enforcement agencies.

98. As of June 3, 2011, nearly one hundred fifty (150) days after commencing his ODE action, Plaintiff still had not received any notice from ODE or Lizana, neither about the merits of his complaint nor about time limits to file with other enforcement agencies. Lizana did not return several of Plaintiff's follow-up inquiries.

99. On June 3, 2011, Plaintiff filed a complaint of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), naming Susan Severo as Respondent.

100.     On June 7, 2011, Plaintiff filed a petition with the UConn Law Registrar's Office challenging the hostile environment surrounding the administration of the Fall 2010 Final Examinations; requesting to retake Plaintiff's first semester exams. Plaintiff's request was rejected without explanation on June 18, 2011.

101.     On June 17, 2011 Plaintiff wrote to the Dean of his law school and his former property professor, Jeremy Paul ("Dean Paul"), citing the UConn policies stating that, "The Dean also is interested in meeting students with critical observations or suggestions for improvement of the School."

102.     Plaintiff told Dean Paul about his negative interactions with Severo and Ouellette. Plaintiff told Dean Paul that he "wish[ed] to petition for their dismissal from working at the law school." Plaintiff told Dean Paul that, "it is my conviction and my belief that Susan Severo and Lisa Ouellette perpetuated unthinkable acts of malice in an effort to discriminate against me because of my nationality and my ethnicity." Plaintiff then requested an audience with Dean Paul to discuss the issue.

103.      Subsequently, Dean Paul wrote to Plaintiff stating, "My understanding is that you have raised your concerns about the conduct of Ms. Severo and Ms. Oulette with

Connecticut's Commission on Human Rights and Opportunities. That office is now investigating the matter. I believe it would be inappropriate for me to meet with you on this matter until that investigation is complete and the CHRO has reached a decision."

104. On July 14, 2011, ODE finally issued a finding stating that there was no finding of discrimination as alleged.

105. On July 18, 2011, Plaintiff filed an Appeal with the President of UConn, in care of the ODE Director, challenging the ODE findings. Plaintiff's Appeal was summarily rejected.

106. On July 22, 2011, UConn Law School provided a formal Answer to Plaintiff's CHRO complaint, citing the ODE findings in support.

107. On November 14, 2011, Dean Paul, along with Michael Eagan ("Eagan"), an attorney with UConn's Office of the General Counsel, attended the CHRO mediation against Plaintiff, who was unrepresented by counsel.

108. Plaintiff was surprised that Dean Paul would appear at the mediation in lieu Susan Severo, especially since Plaintiff had earlier consulted with Dean Paul about his concerns.

109. During the mediation, Dean Paul refused to listen to Plaintiff, but instead, fervently denied Plaintiff's claims of discrimination. Dean Paul told Plaintiff that Severo's adverse treatment of him was based on his own behaviors. Dean Paul also told Plaintiff that he deserved his grades, and that he could not give Plaintiff that which he did not earn.

110. Plaintiff tried to tell Dean Paul about subsequent negative treatment of him by Severo. In response to Plaintiff's request that Severo be moved to another Department within UConn, Paul told Plaintiff that, "we are not going to *transfer* her."

111.     CHRO Investigator Epifanio Carrasquillo ("Epi"), who was tasked with mediating the conference, took a conciliatory stand, favoring the Respondent. Epi told Plaintiff to "take whatever they give you."

112.     Epi also told Plaintiff that he would have little to no chance of prevailing on his claims. Epi then pointed to the imbalance in evidence submitted by Plaintiff as opposed to the Respondent. Epi told Plaintiff that as the ultimate adjudicator of his claims, he would rule against Plaintiff.

113.     Dean Paul eventually asked whether Plaintiff expected to "remain a student in good-standing." Dean Paul then told Plaintiff to consult with him with respect to any problems Plaintiff might have in the future. Dean Paul told Plaintiff that there was no need to pursue his claims with CHRO.

114.     On November 30, 2011, Plaintiff wrote to Dean Paul, requesting an audience in order to discuss his CHRO Complaint. The same day, Dean Paul's Secretary wrote to Plaintiff, telling him that, "I'm sorry but Dean Paul is unable to meet with you until the next step in the CHRO mediation is resolved."

115.     Unfamiliar with the law, Plaintiff heeded Dean Paul's advice. In exchange for dropping his claims, Plaintiff was granted an audience with Severo, the originally charged Respondent.

COUNT ONE: 42 U.S.C. § 1983 AS AGAINST DEFENDANT LISA OUELLETTE

116.     Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

117.     At all relevant times, Defendant Ouellete was the Student Employment Program
         Assistant, tasked with and responsible for, explaining and providing support to University
         Students with regards to the UConn Student Employment Program.

118.     During the course of her interactions with Plaintiff, Ouellette, purposely and
         maliciously, harassed and intimidated Plaintiff through use of words and gestures
         demeaning Plaintiff's nationality and racial differences.

119.     On December 10, 2010, in response to Plaintiff's inquiries about his employment
         with Janis, to commence in mid-January, Defendant Ouellette purposely and maliciously
         misled Plaintiff as to the procedures of obtaining Student Employment, and misled
         Plaintiff into believing that he was ineligible for Student Employment.

120.     Subsequently, Defendant Ouellette corresponded with Severo and Janis for the
         purpose and effect of terminating Plaintiff's employment.

121.     From the forgoing facts, Defendant Ouellette subjected Plaintiff to adverse
         treatment based on Plaintiff's race and nationality.

122.     Defendant Ouellette acted under color of state law as an employee of the
         University of Connecticut.

123.     In each of the above-alleged actions, Defendant Ouellette violated the plaintiff's
         right to property, due process, and equal protection of the laws as protected by the Fifth
         and Fourteenth Amendments to the United States Constitution.

124.     As a result of Defendant Ouellette's deprivation of the plaintiff's civil rights
         under color of state law, the plaintiff suffered substantial damages to physical well-being,
         emotional damages, past and future economic losses, loss of educational and employment

opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT TWO: 42 U.S.C. § 1983 AS AGAINST DEFENDANT SUSAN SEVERO

125.      Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

126.      At all relevant times, Defendant Severo was the Student Employment Program Director, tasked with, and responsible for, administering, explaining, and providing support to University Students with regards to the UConn Student Employment Program.

127.      Throughout the course of her interactions with Plaintiff, Defendant Severo purposely and maliciously, harassed and intimidated Plaintiff through use of words and gestures demeaning Plaintiff's nationality and racial differences.

128.      On December 10, 2010, in response to Plaintiff's inquiries about his employment with Janis, to commence in mid-January, Defendant Severo purposely and maliciously misled Plaintiff as to the procedures of obtaining Student Employment, and misled Plaintiff into believing that he was ineligible for Student Employment.

129.      Subsequently, Defendant Severo corresponded with Ouellette and Janis for the purpose and effect of terminating Plaintiff's employment.

130.      Finally, Severo purposefully and maliciously, intending to cause Plaintiff severe emotional and psychological harm, reported false facts to University Officials, including McLean, Crawford, and Brown, that Plaintiff had cut himself, was suicidal, and was severely disturbed.

131.      From the forgoing facts, Defendant Severo subjected Plaintiff to adverse treatment based on Plaintiff's race and nationality.

132. Defendant Severo acted under color of state law as an employee of the University of Connecticut.

133. In each of the above-alleged actions, Defendant Severo violated the plaintiff's right to property, due process, privacy, and equal protection of the laws, as protected by the Fifth, Ninth, and Fourteenth Amendments to the United States Constitution.

134. As a result of Defendant Severo's deprivation of the plaintiff's civil rights under color of state law, the plaintiff suffered substantial damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT THREE: 42 U.S.C. § 1983 AS AGAINST DEFENDANT UNIVERSITY OF CONNECTICUT

135. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

136. UConn was obliged to provide Plaintiff with a safe and tolerant environment, conducive to equal educational and employment opportunities, free from discrimination and abuse.

137. However, UConn, directly and/or indirectly, through its agents and/or representatives, fostered an atmosphere and culture in which malicious and discriminatory treatment of international, minority students is tolerated and condoned.

138. UConn, directly and/or indirectly, through its agents and/or representatives, improperly denied Plaintiff employment opportunities through use and enforcement of

erroneous policies and procedures regarding hiring international students for Student Employment.

139.      UConn, directly and/or indirectly, through its agents and/or representatives, made a series of disturbing phone calls to plaintiff during the period of law school final examinations. Such phone calls had the purpose and effect of disrupting Plaintiff's preparation for final examinations and debasing Plaintiff's mental and emotional well being.

140.      Subsequently, UConn, directly and/or indirectly, through its agents and/or representatives, failed to properly address claims of misconduct brought by the Plaintiff to the attention of the Administration, the Office of the Registrar, and the Dean's Office.

141.      UConn, directly and/or indirectly, through its agents and/or representatives, failed to properly investigate and adjudicate claims of misconduct brought by the Plaintiff through ODE.

142.      Finally, UConn, directly and/or indirectly, through its agents and/or representatives, acted affirmatively to stifle Plaintiff's claims of discrimination brought to the attention of the CHRO.

143.      UConn directly and/or indirectly, through its agents and/or representatives, acted under color of state law as an entity of the State of Connecticut.

144.      As a direct, foreseeable, and proximate result of UConn's wrongful polices, practices, and customs complained of herein, the plaintiff was deprived of his Fifth and Fourteenth Amendment rights to property, privacy, equal protection of the laws, and due process of the law. As a result, Plaintiff suffered substantial damages to physical well-being, emotional damages, past and future economic losses, loss of educational and

employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT FOUR: CONSPIRACY TO DEPRIVE EQUAL RIGHTS AND PRIVILEGES (42 U.S.C. § 1985(3)) AS AGAINST DEFENDANTS LISA OUELLETTE, SUSAN SEVERO, JANE BROWN, AND THE UNIVERSITY OF CONNECTICUT

145.    Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

146.    Defendants Ouellette, Severo, Brown, and UConn, indirectly and/or directly, through its agents and/or representatives, conspired with each other to achieve the deprivation of the plaintiff's equal rights under the law.

147.    Defendants committed overt acts in furtherance of such conspiracy, including but not limited to the following acts:

148.    On December 10, 2010, Severo and Ouellette purposely and maliciously, through the use of words, gestures, and behaviors, misled Plaintiff as to the procedures of obtaining Student Employment, and misled Plaintiff into believing that he was ineligible for Student Employment. Severo and Ouellette then corresponded with Janis for the purpose and effect of terminating Plaintiff's employment.

149.    Then, during the stressful period of Final Examinations, Defendant Severo falsely reported to UConn Officials, including Mclean, Crawford, and, Brown that Plaintiff had cut himself and was severely disturbed. Subsequently, Brown made a series of disturbing follow-up phone calls to the plaintiff attacking and debasing Plaintiff's mental and physical well-being.

150.　　Finally, UConn, through its agents and/or representatives, including Lizana, Eagan, and Dean Paul, failed to afford Plaintiff adequate due process; debunking Plaintiff's petitions and summarily dismissing Plaintiff's ODE complaints; citing the ODE summary dismissals in response to Plaintiff's CHRO Complaint; and affirmatively acting to stifle Plaintiff's valid and meritorious CHRO complaints of discrimination.

151.　　 Each conspirator entered into such conspiracy based on the claim or perception that the plaintiff was a member of a class of racial and national minority.

152.　　As a result of such conspiracy and overt acts taken in furtherance of the conspiracy, the plaintiff was deprived of his civil rights and rights as a University student and suffered physical injury and emotional distress and injury as more fully described in this Complaint.

153.　　As a result of such conspiracy and overt acts taken by conspirators, each party to the conspiracy is liable for the overt acts of the co-conspirators.

COUNT FIVE: 42 U.S.C. § 1981 AS AGAINST DEFENDANT SUSAN SEVERO, JANE BROWN, AND LISA OUELLETTE

154.　　Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

155.　　At all times relevant hereto, Plaintiff had a protected property interest in his contract for employment as a Research Assistant with Janis.

156.　　At all times relevant hereto, Plaintiff had a protected property interest in pursuing his studies by virtue of his status as a University student free from harassment and abuse.

157.     At all times relevant hereto, Plaintiff had a protected property interest, pursuant to his contract with UConn to take his law school final examinations free from harassment and abuse.

158.     During the course of their interactions, Plaintiff identified himself to Severo, Brown, and Ouellette as an International Student at UConn of Asian Descent.

159.     Subsequently, Ouellette, and Severo purposely and maliciously, harassed and intimidated Plaintiff through use of words and gestures demeaning Plaintiff's nationality and racial differences.

160.     Acting in concert, Severo and Ouellette purposely and maliciously misled Plaintiff as to the procedures of obtaining Student Employment, and misled Plaintiff into believing that he was ineligible for Student Employment. Severo and Ouellette then corresponded with Janis for the purpose and effect of terminating Plaintiff's employment.

161.     Subsequently, Defendant Severo purposely and maliciously reported false facts about Plaintiff's physical and emotional well being to University Officials, including the fact that Plaintiff had purposely cut himself and was severely disturbed.

162.     Finally, Brown repeatedly telephoned and left voice messages for plaintiff, debasing Plaintiff's physical and mental well-being. Brown then forced Plaintiff to meet with and explain himself to herself and other members of the UConn Law Administration. Upon meeting with Plaintiff, Brown disregarded and debunked Plaintiff's concerns, and accused Plaintiff of fabricating his interactions with Severo and Ouellette.

163.     Ouellette, Brown, and Severo's actions caused Plaintiff severe mental and emotional distress, and impaired Plaintiff's abilities to study for his Final Examinations.

164.     Ouellette, Brown, and Severo engaged in intentional discrimination based on Plaintiff's race, color, religion, ancestry, and/or national origin and caused Plaintiff to suffer deprivation of his right to enjoy, make, and enforce educational and/or employment contracts.

165.     Defendants Ouellette, Brown, and Severo's actions violated 42 U.S.C.A. § 1981.

166.     As a direct, foreseeable, and proximate result of Ouellette, Brown, and Severo's conduct complained of herein, the plaintiff was deprived of his Fifth and Fourteenth Amendment rights as described above, and suffered substantial damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT SIX: 42 U.S.C. § 1981 AS AGAINST DEFENDANT UNIVERSITY OF CONNECTICUT

167.     Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

168.     At all times relevant hereto, Plaintiff also had a protected property interest in his contract for employment as a Research Assistant.

169.     At all times relevant hereto, Plaintiff had a protected property interest in pursuing his studies by virtue of his status as a University student free from harassment and abuse.

170.     At all times relevant hereto, Plaintiff had a protected property interest, pursuant to his contract with UConn to take his law school final examinations free from harassment and abuse.

171.     At all times relevant to the events described above, Defendants Ouellette, Severo, and Brown were employees, agents, and/or representatives of UConn.

172.     UConn, directly and/or indirectly, through its agents and/or representatives, deprived Plaintiff of his property interests to education and employment opportunities through the aforementioned acts.

173.     The discriminatory practices described above were carried out:

    a.  At the direction of and with the consent, encouragement, knowledge, ratification of UConn;

    b.  Under Defendant UConn's authority, control, and supervision; and/or

    c.  Within the scope of the employees' employment.

174.     Defendant UConn is liable for the unlawful acts of its employees, agents, and/or representatives directly and/or under the doctrine of respondeat superior.

175.     Defendant UConn, directly and/or indirectly, through its agents and/or representatives, engaged in intentional discrimination based on Plaintiff's race, color, religion, ancestry, and/or national origin and caused Plaintiff to suffer deprivation of his right to enjoy, make, and enforce educational and/or employment contracts.

176.     Defendant UConn's actions violated 42 U.S.C.A. § 1981.

177.     As a direct, foreseeable, and proximate result of UConn's wrongful polices, practices, and customs complained of herein, the plaintiff was deprived of his Fifth and Fourteenth Amendment rights as described above, and suffered substantial damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT SEVEN: INTIMIDATION BASED UPON BIGOTRY OR BIAS (C.G.S. § 52-571c &

53a-181j et seq.) AS AGAINST DEFENDANT LISA OUELLETTE

178.     Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth

herein.

179.     On or before December 10, 2010, Plaintiff self-identified himself to Ouellette as

an international student at UConn and a visible minority of Asian Descent.

180.     Defendant Ouellette believed that Plaintiff was Asian, of Asian race and/or

ethnicity and an international student.

181.     Defendant Ouellette harassed and intimidated Plaintiff and caused the Plaintiff

serious emotional and psychological injury.

182.     Defendant Ouellette intended to harass and intimidate the Plaintiff based on the

perceived race and/or nationality of the Plaintiff.

183.     If Ouellette did not believe that the plaintiff was an international student of Asian

Descent, she would not have purposely and maliciously, harassed and intimidated

Plaintiff through use of words and gestures demeaning Plaintiff's nationality and racial

differences.

184.     If Ouellette did not believe that the plaintiff was an international student of Asian

Descent, she would not have purposely and maliciously, through the use of words,

gestures, and behaviors, misled Plaintiff as to the procedures of obtaining Student

Employment, and misled Plaintiff into believing that he was ineligible for Student

Employment.

185. If Ouellette did not believe that the plaintiff was an international student of Asian Descent, she would not have falsely misstated to Severo and Janis that Plaintiff was ineligible for Student Employment.

186. Defendant Ouellette caused the Plaintiff serious emotional and psychological injury with the specific intent to harass or intimidate the Plaintiff.

187. Defendant Ouellette intended to harass or intimidate the plaintiff, based on the perceived race, ethnicity and/or nationality of the plaintiff.

188. As a result of said Defendant Ouellette's attacks on the plaintiff, the plaintiff has suffered substantial damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT EIGHT: INTIMIDATION BASED UPON BIGOTRY OR BIAS (C.G.S. § 52-571c & 53a-181j et seq.) AS AGAINST DEFENDANT SUSAN SEVERO

189. Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

190. On or before December 10, 2010, Plaintiff self-identified himself to Severo as an international student at UConn and a visible minority of Asian Descent.

191. Defendant Severo believed that Plaintiff was Asian, of Asian race and/or ethnicity and an international student.

192. Defendant Severo harassed and intimidated Plaintiff and caused the Plaintiff serious emotional and psychological injury.

193. Defendant Severo intended to harass and intimidate the Plaintiff based on the perceived race and/or nationality of the Plaintiff.

194.     If Severo did not believe that the plaintiff was an international student of Asian Descent, she would not have purposely and maliciously, through the use of words, gestures, and behaviors, misled Plaintiff as to the procedures of obtaining Student Employment, and misled Plaintiff into believing that he was ineligible for Student Employment.

195.     If Severo did not believe that the plaintiff was an international student of Asian Descent, she would not have purposely and maliciously slammed USCIS forms in close proximity to the plaintiff's face.

196.     If Severo did not believe that the plaintiff was an international student of Asian Descent, she would not have threatened Plaintiff with use of force by Federal Law Enforcement Personnel.

197.     If Severo did not believe that the plaintiff was an international student of Asian Descent, she would not have corresponded with Ouellette and Janis for the purpose and effect of terminating Plaintiff's employment.

198.     If Severo did not believe that the plaintiff was an international student of Asian Descent, she would not have purposely and maliciously reported false facts about the Plaintiff's physical and mental well being to University Officials.

199.     Defendant Severo caused the Plaintiff serious emotional and psychological injury with the specific intent to harass or intimidate the Plaintiff.

200.     Defendant Severo intended to harass or intimidate the plaintiff, based on the perceived race, ethnicity and/or nationality of the plaintiff.

201.     As a result of said Defendant Severo's attacks on the plaintiff, the plaintiff has suffered substantial damages to physical well-being, emotional damages, past and future

economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT NINE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS AGAINST DEFENDANT LISA OUELLETTE

202.     Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

203.     Defendant Ouellette intended to cause the Plaintiff severe emotional distress, or knew or should have known that such distress was a likely result of her actions.

204.     On or before December 10, 2010, Ouellette purposely and maliciously misled Plaintiff as to the procedures of obtaining Student Employment, and misled Plaintiff into believing that he was ineligible for Student Employment. Subsequently, Ouellette corresponded with Severo and Janis for the purpose and effect of terminating Plaintiff's employment.

205.     Ouellette also purposely and maliciously, harassed and intimidated Plaintiff through use of words and gestures demeaning Plaintiff's nationality and racial differences.

206.     The emotional distress of the plaintiff was a foreseeable consequence of Defendant Ouellette's actions, which were extreme, outrageous and shocking to the conscience.

207.     As a direct, foreseeable, and proximate result of the actions of Defendant Ouellette as described above, Plaintiff has suffered substantial damages to physical well-being, emotional damages, past and future economic losses, loss of educational and

employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT TEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS AGAINST DEFENDANT SUSAN SEVERO

208.    Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

209.    Defendant Severo intended to cause the Plaintiff severe emotional distress, or knew or should have known that such distress was a likely result of her actions.

210.    On December 10, 2010, Severo purposely and maliciously misled Plaintiff as to the procedures of obtaining Student Employment, and misled Plaintiff into believing that he was ineligible for Student Employment. Severo then corresponded with Janis for the purpose and effect of terminating Plaintiff's employment.

211.    Severo then threatened and acted violently towards Plaintiff; slamming sheets of USCIS forms in close proximity to Plaintiff's face, while threatening Plaintiff with use of force by Federal Immigration Officials.

212.    The same night, Severo, falsely and maliciously stated, to members of the UConn Administration, including Brown, Crawford, and McLean that plaintiff had cut himself and was suicidal and severely disturbed.

213.    The emotional distress of the plaintiff was a foreseeable consequence of Defendant Severo's actions, which were extreme, outrageous and shocking to the conscience.

214.    As a direct, foreseeable, and proximate result of the actions of Defendant Severo as described above, Plaintiff has suffered substantial damages to physical well-being,

emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT ELEVEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO DEFENDANT JANE BROWN

215.     Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

216.     Defendant Brown intended to cause the Plaintiff severe emotional distress, or knew or should have known that such distress was a likely result of her actions.

217.     On the night of December 10, 2010, during the stressful period of Final Examinations, Brown repeatedly telephoned and left voice messages for plaintiff, alleging that Plaintiff had cut himself; alleging that Plaintiff was suicidal, debasing Plaintiff's physical and mental well-being; and mischaracterizing and ridiculing plaintiff's personal medical issues and his unrelated visits to Hartford Hospital. Brown also forced Plaintiff to meet with and explain himself to herself and other members of the UConn Law Administration.

218.     On December 13, 2010, upon meeting with Plaintiff, Brown disregarded and debunked Plaintiff's concerns, and accused Plaintiff of fabricating his interactions with Severo and Ouellette.

219.     The emotional distress of the plaintiff was a foreseeable consequence of Defendant Brown's actions, which were extreme, outrageous and shocking to the conscience.

220.     As a direct, foreseeable, and proximate result of the actions of Defendant Brown as described above, Plaintiff has suffered substantial damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT TWELVE: INVASION OF PRIVACY AS TO DEFENDANT SUSAN SEVERO

221.     Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

222.     Defendant Severo falsely and maliciously represented to members of the UConn administration, including Brown, Crawford, and Mclean, that plaintiff had stated that he cut himself and that Plaintiff was suicidal and severely disturbed.

223.     Defendant Severo knew that Plaintiff did not state that he had cut himself.

224.     Defendant Severo knew that Plaintiff was neither suicidal nor severely disturbed.

225.     This major misrepresentation of the plaintiff's mental conditions is offensive and would be offensive or embarrassing to the average person.

226.     This disclosure constituted publicity.

227.     There was no legitimate public concern that required disclosure of this information.

228.     Defendant Severo's unauthorized disclosure of such information to the UConn administration constitutes publication of private facts or portrayal of the plaintiff in a false light, in violation of the plaintiff's common law rights to privacy.

229.     As a direct, foreseeable, and proximate result of Defendant Severo's violation of the plaintiff's privacy rights, Plaintiff has suffered substantial damages to physical well-

being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT THIRTEEN: INVASION OF PRIVACY AS TO DEFENDANT JANE BROWN

230.    Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

231.    On the night of December 10, 2010, Plaintiff had a reasonable expectation of privacy and solitude during the stressful period of Final Examinations.

232.    However, Brown singled Plaintiff out and repeatedly telephoned and left voice messages for plaintiff; alleging that Plaintiff had cut himself; alleging that Plaintiff was suicidal; debasing Plaintiff's physical and mental well-being; and twisting, mischaracterizing, and ridiculing plaintiff's personal medical issues and his unrelated visits to Hartford Hospital. Brown then forced Plaintiff to explain himself to Brown and other members of the UConn Law Administration.

233.    Interrupting Plaintiff's studies further, Brown forced Plaintiff to meet with herself and other members of the UConn Administration the next business day. During the meeting Brown disregarded and debunked Plaintiff's concerns, and instead, disparaged Plaintiff and accused him of fabricating his interactions with Severo and Ouellette.

234.    As a direct, foreseeable, and proximate result of Defendant Brown's violation of the plaintiff's privacy rights, Plaintiff has suffered substantial damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT FOURTEEN: VICARIOUS LIABILITY AS AGAINST DEFENDANT UNIVERSITY OF CONNECTICUT

235.     Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

236.     At all relevant times, Defendant UConn employed Defendant Severo, Defendant Ouellette, and Defendant Brown. Severo, Ouellete, and Brown were under Defendant UConn's employ and control when they committed the wrongful acts alleged herein. Severo, Ouellette, and Brown engaged in their conduct while acting in the course of their employment with Defendant UConn, and while serving as an agent of Defendant UConn. Therefore, Defendant UConn is liable for the wrongful conduct of Severo, Ouellette, and Brown under the doctrine of vicarious liability, including the doctrine of respondeat superior.

237.     As a direct, foreseeable, and proximate result of the conduct described, Plaintiff has suffered substantial damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation. Some of these injuries are permanent in nature.

COUNT FIFTEEN: DECLARATORY RELIEF AS AGAINST DEFENDANTS SUSAN SEVERO, LISA OUELLETTE, JANE BROWN, AND THE UNIVERSITY OF CONNECTICUT

238.     Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

239.     Defendants Severo, Ouellette, Brown, and the University of Connecticut have committed numerous violations of the Plaintiff under federal and state law.

240.     Without appropriate redress, the outcome of Defendants' actions will continue to cause irreversible damages to Plaintiff, with no end in sight.

241.     No remedy at law is adequate to redress the injury to the plaintiff caused by the Defendants' actions.

242.     By reason of the foregoing, Plaintiff requests a declaration that: (i) Plaintiff's civil rights have been violated, including a finding that Plaintiff's rights under the federal and state constitution have been violated; (ii) UConn's rules, regulations and guidelines are unconstitutional as applied; (iii) any such other and further relief as the Court deems just and proper.

COUNT SIXTEEN: INJUNCTIVE RELIEF AS AGAINST DEFENDANTS SEVERO, OUELLETTE, BROWN, AND THE UNIVERSITY OF CONNECTICUT

243.     Plaintiff incorporates and realleges all preceding paragraphs as if fully set forth herein.

244.     Defendants Severo, Ouellette, Brown, and the University of Connecticut have committed numerous violations of the Plaintiff under federal and state law.

245.     As a result, Plaintiff's UConn academic transcripts have been affected and currently contain negative statements regarding the plaintiff, damaging the plaintiff's reputation and educational and economic opportunities.

246.     Without appropriate redress, the outcome of Defendants' actions will continue to cause irreversible damages to Plaintiff, with no end in sight.

247.     By reason of the foregoing, Plaintiff requests an injunction that:  (i) Plaintiff's UConn academic records ordered redacted, re-evaluated, and/or Plaintiff be allowed to retake his Fall 2010 semester examinations; (ii) Plaintiff's tuition be reimbursed; (iii)

Defendants Severo, Ouellette, and Brown's employment be suspended and/or terminated; (iv) any such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

1. On the first cause of action for violation of 42 U.S.C. § 1983, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

2. On the second cause of action for violation of 42 U.S.C. § 1983, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

3. On the third cause of action for violation of 42 U.S.C. § 1983, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to

reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

4. On the fourth cause of action for violation of 42 U.S.C. § 1985, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

5. On the fifth cause of action for violation of 42 U.S.C. § 1981, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

6. On the sixth cause of action for violation of 42 U.S.C. § 1981, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

7. On the seventh cause of action for intimidation based upon bigotry or bias, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

8. On the eight cause of action for intimidation based upon bigotry or bias, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

9. On the ninth cause of action for intentional infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

10. On the tenth cause of action for intentional infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

11. On the eleventh cause of action for intentional infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

12. On the twelfth cause of action for invasion of privacy, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

13. On the thirteenth cause of action for invasion of privacy, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to

physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

14. On the fourteenth cause of action for vicarious liability, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional damages, past and future economic losses, loss of educational and employment opportunities, and humiliation and damage to reputation; plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; punitive and/or double or treble damages as appropriate; and all other relief in law or equity as the court deems just and proper.

15. On the fifteenth cause of action for a declaratory judgment, a judicial declaration that: (i) Plaintiff's civil rights have been violated, including a finding that his rights under the federal and state constitutions have been violated; (ii) UConn's rules, regulations and guidelines are unconstitutional as applied; (iii) any such other and further relief as the Court deems just and proper.

16. On the sixteenth cause of action for an injunction, a judicial declaration that: (i) Plaintiff's UConn academic records ordered redacted, re-evaluated, and/or Plaintiff be allowed to retake his Fall 2010 semester examinations; (ii) Plaintiff's tuition be reimbursed; (iii) Defendants Brown, Severo, Ouellette's employment be suspended and/or terminated; (iv) any such other and further relief as the Court deems just and proper.

**Dated: February 3, 2014**

**YIFEI HE,**

 **PLAINTIFF**

<u>/s/ Yifei He</u>

Yifei He
112 Ave T
Brooklyn, NY 11223
Phone: (917) 892-8722
E-mail: cgoppy@gmail.com

JURY DEMAND

Yifei He herein demands a trial by jury for all triable issues in the present matter.


**Dated: February 3, 2014**


/s/ Yifei He

Yifei He
112 Ave T
Brooklyn, NY 11223
Phone: (917) 892-8722
E-mail: cgoppy@gmail.com

**Certificate of Service**

I hereby certify that on February 3, 2014, a copy of foregoing Proof of Service was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Yifei He

Yifei He
112 Ave T
Brooklyn, NY 11223
Phone: (917) 892-8722
E-mail: cgoppy@gmail.com